## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex. rel.* | ) | |
| MILAGROS PEREZ and | ) | |
| MILAGROS PEREZ, individually, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 08-cv-4326 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| MICHAEL WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2021, Defendant Michael Williams filed a motion to vacate a default judgment entered against him in 2012, nine years earlier. He argued that he was never served with process, and he put forward an elaborate story of mistaken identity. He basically claimed that the process server handed the papers to his buddy, who was working on a muscle car in his garage. Williams, meanwhile, was 100 miles away.

Williams supported his motion with three declarations. Or so it seemed. One declaration purported to come from his friend, Ken Sisk, the aspiring mechanic who allegedly received the papers. The second declaration allegedly came from Katie Beach, a longtime friend who claimed that she was with Williams in a distant town on the day of service. And the third declaration came from Williams himself.

That story did not hold up well. The parties requested an evidentiary hearing, so this Court issued a series of Orders to lay the groundwork. This Court wanted to hear from Sisk and Beach directly. And then, before the hearing, the witnesses melted away.

A few days before the hearing, Williams filed a motion to withdraw the declaration of Ken Sisk. A day later, Williams announced that Katie Beach – his longtime friend – mysteriously couldn't be found.

At the hearing, things got even more bizarre. Sisk did not testify, and neither did Beach. Williams did not testify, either. Instead, Williams invoked the Fifth Amendment. In a matter of days, Williams went from telling a story, to saying nothing.

The collapse of the story did not inspire confidence. To vacate a judgment based on a lack of service of process, a party must make a strong and convincing showing that the facts in the proof of service are inaccurate. Here, Williams did not come close to making that showing. His story was weak and unconvincing.

So unconvincing, in fact, that he believes that truthful answers could place him in criminal jeopardy. A story isn't convincing when the storyteller admits that the truth might lead to an indictment.

But the Court did hear convincing testimony from Ronald Nixon, the indefatigable process server who tagged Williams with process in 2012. Nixon testified about how hard it was to locate Williams, who seemed to evade every attempt at service of process. And more importantly, Nixon testified that he did, in fact, serve Williams with process. He remembers it well, and based on what happened, it was undoubtedly memorable. Williams refused to take the papers, and when Nixon put them on the ground, Williams put them on Nixon's windshield, right under the windshield wipers.

Williams has gone to great lengths to evade this lawsuit. Service of process was quite an ordeal. It took multiple months, and multiple tries, by multiple people. But a process server

eventually served him. The effort to dodge the lawsuit continued to the present, when Williams peddled an implausible story about mistaken identity.

The evasive maneuvers didn't work, and the games are now over. For the reasons stated below, the motion to vacate the default judgment is hereby denied.

## Background

### I.     The Lawsuit

Plaintiff Milagros Perez brought this *qui tam* case in 2008, more than a decade before this Court took the bench. The case was assigned to Judge Lindberg (in 2011), and then to Judges Hart and Conlon (in 2013), and then to this Court (in 2021). So, this Court had to do a bit of digging in the docket to excavate the background and unearth the backstory.

The case involves allegations about the mistreatment of a resident of Section 8 housing. Plaintiff Perez rented residential property from Defendant Williams on the north side of Chicago from 2003 to 2005. The property was subsidized by HUD, so federal regulations governed the landlord-tenant relationship.

According to the complaint, Perez was a vulnerable tenant, above and beyond her poverty. "Ms. Perez is a 58-year-old widow who suffers from depression and an anxiety disorder. Ms. Perez also suffers from muscular problems, which have required at least one surgery on her arm. Ms. Perez has limited proficiency in spoken English, and is illiterate in written English." *See* Cplt., at ¶ 18 (Dckt. No. 1).

Perez claimed that Williams overcharged her for rent (by demanding side payments), and required too hefty of a security deposit. *Id.* at ¶¶ 28, 30, 32–34, 44–45. She paid $6,927.61 more than she was supposed to pay. *Id.* at ¶ 34. Perez brought claims under the False Claims Act, as

well as claims under state law and a local ordinance. *Id.* The United States declined

intervention. *See* Notice of Election to Decline Intervention (Dckt. No. 11).

## II.    Service of Process

Perez then embarked on service of process. And it was a long-drawn-out process.

A summons issued in February 2011, but Williams couldn't be found. Perez filed a

motion for an extension of time in March 2011, explaining that "Plaintiff could no longer locate

the Defendant, Michael P. Williams," because of the "passage of time." *See* 3/16/11 Mtn. (Dckt.

No. 17). Plaintiff's counsel hired an investigator, who determined that Williams resided at

"3936 Bell Mountain Drive, Castle Rock, Colorado." *Id.* A process server went to that house,

but was "unable to identify occupant." *Id.*

Perez requested a 120-day extension, but Judge Lindberg gave her 60 days. *See* 3/17/11

Order (Dckt. No. 19).

More motions followed, requesting more extensions. Perez moved for more time in May

2011 (Dckt. No. 20), and June 2011 (Dckt. No. 23), and August 2011 (Dckt. No. 26), and

October 2011 (Dckt. No. 30). The process server encountered problem after problem. For

example, the female occupant of the residence "refused to identify herself." *See* 5/17/11 Mtn., at

¶ 9 (Dckt. No. 20). Plaintiff's counsel had to submit a FOIA request to HUD for a copy of

Defendant's driver's license, in the hope of being able to identify him. *See* Williams Driver's

License (Dckt. No. 20-1).

Even the authorities had no luck. Perez used the services of the local Sheriff's Office.

The Sheriff's Office made six attempts to serve Williams in May and June 2011, without

success. *See* 6/28/11 Mtn., at ¶¶ 10–13 (Dckt. No. 23). On the second attempt, the deputy left

his business card. *See* Douglas County Sheriff's Office Civil Process Aff. (Dckt. No. 23-1). On

the third try, the business card was gone, and a white car was in the garage. *Id.* But Williams never contacted the Sheriff's Office.

Perez had to hire a second investigator, too. *Id.* at ¶ 14. Perez even hired a second process server. *See* 8/2/11 Mtn., at ¶ 15 (Dckt. No. 26). His luck wasn't any better. *Id.*

Along the way, Judge Lindberg granted all five requests for extensions (at least in part). *See* 3/17/11 Order (Dckt. No. 19); 5/17/11 Order (Dckt. No. 22); 6/28/11 Order (Dckt. No. 25); 8/3/11 Order (Dckt. No. 28); 10/19/11 Order (Dckt. No. 32).

Months later, in July 2012, Judge Lindberg issued an order to show cause why the case should not be dismissed for lack of service of process. *See* 7/26/12 Order (Dckt. No. 35). "The Court is aware of the difficulties plaintiff has encountered in attempting to serve defendant. However, plaintiff has had more than 18 months to attempt to serve defendant and has not been successful. This case cannot remain pending without service indefinitely." *Id.*

In her response, Perez reported that Defendant Williams had "successfully evaded service despite multiple attempts at service at his home, located at 3936 Bell Mountain Drive, Castle Rock, CO." *See* Pl.'s Resp., at ¶ 1 (Dckt. No. 36). Through it all, Perez had "engag[ed] the services of the Douglas County Sheriff, two private process servers, and two skip tracer companies." *Id.* at ¶ 2.

After conducting additional background checks, Perez discovered that Williams had "purchased a second home" at "600 Wheat Way, Fairplay, CO." *Id.* at ¶ 4. So, once again, Perez retained a process server to serve him "at this new address," and if unsuccessful, Perez would make "one last service attempt" at the address in Castle Rock, Colorado. *Id.* at ¶ 5.

In response, Judge Lindberg gave Perez one final month to effectuate service of process. The Court set a deadline of August 31, 2012. *See* 7/27/12 Order (Dckt. No. 37).

5

Perez met that deadline. On August 17, 2012, at long last, Perez filed a proof of service. According to the affidavit, the process server effectuated service "by refusal at 3936 Bell Mountain Drive, Castle Rock, CO as provided in C.R.C.P. 4(k)." *See* Return of Service (Dckt. No. 38). Service took place on August 14, 2012. *Id.*

The proof of service included a narrative description of what the process server went through. It wasn't easy. But it was colorful. Basically, he gave the papers to Williams in his garage, but Williams refused to accept them:

> I identified the Defendant Michael Williams by the attached photo [*i.e.*, the driver's license] who was kneeling in the garage at the above mentioned address and denied his identity and refused service. When the Defendant refused my second offer of service, I cited that the summons, complaint, notice and order dated 11/23/10 were served by refusal and left said documents on the garage floor next to the Defendant.

*Id.* at 2 of 3. The process server signed and dated the proof of service, under penalty of perjury. *Id.*

Two months later, on October 17, 2012, Perez filed an amended complaint. *See* Am. Cplt. (Dckt. No. 41). But Williams did not file a response to the amended complaint. On November 5, 2012, Perez filed a motion for entry of default under Rule 55(a), which Judge Lindberg granted. *See* 11/5/12 Mtn. (Dckt. No. 44); 11/6/12 Order (Dckt. No. 46).

Perez then filed a motion for a default judgment. *See* 11/20/12 Mtn. (Dckt. No. 47).[1] The motion stated that HUD had dispersed $22,229 in Housing Assistance Payments to Williams

---

[1]  The motion for default judgment dated November 20, 2012 did not include a certificate of service (presumably in violation of the then-applicable Rules – the current version is Federal Rule 5(d)(1)(B)(i)). *See* Mtn. for Default Judgment (Dckt. No. 47). So, this Court does not know for certain if Perez ever mailed a copy of that motion to Williams in 2012. The accompanying notice of motion says that Plaintiff's counsel served a copy on the U.S. Attorney's Office, but says nothing about service on Williams himself. *See* Notice of Motion (Dckt. No. 48). So, maybe Williams had an argument that he never received notice of the motion for default judgment itself. But Williams has never advanced any such argument, so it is waived. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district

6

during the 26 months that he received "side rent" from Perez. She sought civil penalties of not less than $5,500 and not more than $11,000 for each violation. *Id.* at ¶ 48.B. She also sought three times the damages suffered by HUD ($22,229 x 3 = $66,687). *Id.* at ¶ 48.C. And she sought damages for the other claims, too.

Judge Lindberg entered a default judgment on November 29, 2012. *See* Judgment (Dckt. No. 51).[2] The Court found 26 separate violations of the False Claims Act from October 2003 to November 2005. The Court also found that Williams had accepted $6,927.61 more than he was supposed to receive for rent and a security deposit. *Id.* The Court ultimately assessed a civil penalty of $234,000, constituting a penalty of $9,000 for each of the 26 violations. The Court also assessed damages of $66,687, constituting three times the amount of damages ($22,229) that the United States sustained. The Court also awarded $27,871.28 on the claims under state law and the local ordinance. All told, the default judgment totaled $328,558.28. *Id.*

After reassignment in 2013, Judge Conlon awarded attorney's fees, too, totaling $32,795. *See* 3/19/13 Order (Dckt. No. 57).

Then, things went quiet for eight years. Apparently, Perez had no luck collecting on the judgment.

---

court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court."). Instead, he exclusively argues that he never received service of process under Rule 4, not service of later filings under Rule 5.

[2] Judge Lindberg's docket entry for the judgment says "Mailed notice." *See* Judgment (Dckt. No. 51). This Court does not know if the Clerk's Office ever mailed a copy of the judgment to Williams himself, and if so, where. But once again, Williams makes no such argument, so it is waived. This Court raised that issue during the recent evidentiary hearing, but no one knew if Williams ever received a copy of the judgment in 2012. *See* 12/13/21 Tr., at 85–86.

### III.    The Challenge to Service of Process

In 2019, the case began to reawaken.  The government located Williams and reached out to him about collecting the judgment.  He then went to the U.S. Attorney's Office, and pled poverty.

In 2021, the case sprung back to life, after a long period of dormancy.  This Court received a pair of motions.  Williams filed a motion to vacate the judgment, based on a lack of service of process.  *See* 4/23/21 Mtn. (Dckt. No. 63).[3]  A few days later, the government filed a motion for a writ of execution on a property owned by Williams in Roscoe Village, a neighborhood in Chicago.  *See* 4/26/21 Mtn. (Dckt. No. 65).

Williams submitted three declarations to support his motion to vacate the judgment.  The first came from Ken Sisk (or so it appeared), a "longtime friend" of Williams.  *See* Sisk Dec., at ¶ 2 (Dckt. No. 63-4).  The punchline is that Sisk claimed that the process server served *him*, not Williams.  But Sisk refused to take the papers.

According to the declaration, Sisk was repairing a car in the garage at the home of Williams – located at 3936 Bell Mountain Drive in Castle Rock, Colorado – on August 14, 2012.  *Id.* at ¶ 3.  Late that morning, a dark sedan pulled up, and a man hopped out.  *Id.* at ¶¶ 4–5.  "The

---

[3]  The evidentiary hearing focused on the argument about mistaken identity.  During a hearing on November 23, 2021 (*i.e.*, before the evidentiary hearing on December 13), this Court rejected a second argument from Williams.  He argued that service of process was ineffective because he never received formal service of process for the amended complaint, which Plaintiff filed a few months after the disputed service of process.  *See* Mtn. to Vacate, at 11–15  (Dckt. No. 63).  According to the proof of service, the service of process took place on August 14, 2012, but Plaintiff later filed an amended complaint dated October 17, 2012.  *See* Return of Service (Dckt. No. 38) (confirming service of process on August 14, 2012); Am. Cplt. (Dckt. No. 41) (filed on October 17, 2012).  According to Williams, the filing of an amended complaint required another round of service of process under Rule 4, which never took place.  Not so.  The Federal Rules do not require formal service of process under Rule 4 on a defaulting defendant for an amended complaint, unless the amended complaint adds a new claim.  *See* Fed. R. Civ. P. 5(a)(2) ("No service is required on a party who is in default for failing to appear.  But a pleading that asserts a new claim for relief against such a party must be served on that party under Rule 4.")  Here, the amended complaint did not add a new claim (as defense counsel acknowledged at the hearing).  *See* 11/23/21 Tr., at 6–12.

8

man started walking towards me with a stack of papers in his hand and identified me as Michael Williams. I told him plainly that I was not Michael Williams and that my name was Ken Sisk." *Id.* at ¶ 5.

The process server "responded by saying 'Michael Williams, you've been served,' or similar words, and then threw a pile of papers on the floor of the garage I was working in." *Id.* at ¶ 6. But Sisk "said again that [he] was not Michael Williams and did not want these papers." *Id.* at ¶ 7.

The process server walked away. *Id.* at ¶ 8. So Sisk picked up the papers, and followed the process server to his car. *Id.* The process server wouldn't take the papers back. *Id.* He got in his car, and locked the door. *Id.* at ¶ 9. At that point, Sisk didn't have a lot of options if he wanted the process server to drive off with the papers.

So he made do with what he had at his disposal. "I set the papers on the car's windshield under a wiper blade," treating the windshield wipers like an oversized binder clip. *Id.* The process server then drove off. *Id.*

According to the declaration, Williams wasn't on the property when service of process took place. *Id.* at ¶ 12. Sisk told Williams what happened later that day. *Id.* at ¶ 13. But he didn't know the name of the case, and he didn't have the papers, either. *Id.*

Williams supported his motion with a second motion from another "longtime friend," Katie Beach. *See* Beach Dec., at ¶ 2 (Dckt. No. 63-5). According to the declaration, Beach spent the day in question (August 14, 2012) with Williams. *Id.* at ¶ 3. But they weren't anywhere near 3936 Bell Mountain Drive in Castle Rock, Colorado, where service of process took place. *Id.* Instead, they spent the day together at a second home belonging to Williams, at 600 Wheat Way in Fairplay, Colorado. *Id.* at ¶ 3.

Williams and Beach spent the day together, in that distant town. *Id.* at ¶ 4. So it would have been a "physical impossibility" for a process server to have served Williams at his home at 3936 Bell Mountain Drive in Castle Rock, Colorado. *Id.* at ¶ 5.

The third and final declaration came from Williams himself. *See* Williams Dec. (Dckt. No. 63-3). Williams stated that he was at his home at 600 Wheat Way in Fairplay, Colorado on August 14, 2012. *Id.* at ¶ 4. He "woke up at and slept at the Wheat Way property on that day." *Id.* Williams claimed that Katie Beach was with him. *Id.* at ¶ 6. He thinks that he was working on his house, doing "some improvements to the property my wife had requested." *Id.* at ¶ 5.

Williams represented that he was "never – at any time – present at my property located at 3936 Bell Mountain Drive, Castlerock, CO" on August 14, 2012. *Id.* at ¶ 7. But he heard about what happened there. According to the declaration, Williams spoke with Sisk a few days later, and Sisk told him about the wild experience with the process server. *Id.* at ¶ 9; *see also id.* at ¶ 9(b) (claiming that Sisk "denied the identification, refused the paperwork, and ultimately placed the legal paperwork under the windshield wiper of the man's sedan before he drove away with the papers still there").

But Sisk told him nothing about the underlying lawsuit – not the case name, or the case number, or where the case was pending. *Id.* at ¶¶ 10–11. So according to Williams, he was left completely in the dark about what the process server was trying to deliver. (As an aside, if that story were true, one might think that Williams would be less than pleased with Sisk. If everything is on the up and up, most people wouldn't be thrilled if someone at their house received legal process, and then chased away the process server, leaving the would-be recipient in the dark without a copy of the papers.)

Williams represented that he had no knowledge of this lawsuit until 2019, when he started getting letters and notices about liens. *Id.* at ¶ 12. He also promised that the process server never served him with process: "I had never seen, much less been personally served with, any complaint or amended complaint in this matter at any time prior to learning of the lawsuit as described in the previous paragraph." *Id.* at ¶ 13.

Williams signed the declaration under penalty of perjury. "I declare under penalty of perjury that all of the information listed above is true and correct. I understand that a false statement may result in sanctions." *Id.* at 3.

Viewed as a whole, this Court heard a pair of competing stories. The process server claimed that he served Williams, but Williams claimed that he was more than 100 miles away. The Seventh Circuit requires district courts to hold an evidentiary hearing when there are disputed questions of fact about service of process. *See Durukan Am., LLC v. Rain Trading, Inc.*, 787 F.3d 1161, 1164 (7th Cir. 2015) ("To resolve the dispute between the conflicting evidence, the district court needed to hold an evidentiary hearing. It erred by ruling that it could just disregard Canbulat's affidavit.").

This Court reached out to the parties to confirm that they did, in fact, seek an evidentiary hearing. *See* 11/23/21 Order (Dckt. No. 75). All parties responded that they wanted an evidentiary hearing. *See* Joint Statement (Dckt. No. 78).

So this Court started laying the groundwork. The Court directed the parties to contact the witnesses, and ordered that the hearing would take place by video. *See* 12/3/21 Order (Dckt. No. 80). The Court also made special accommodations for Ken Sisk, because Williams claimed that Sisk was bedridden with leukemia in Hawaii. *Id.*; *see also* Def.'s Notice of Filing, at 1–2 (Dckt. No. 77); Joint Statement, at 1 (Dckt. No. 78).

The Court also ordered some targeted discovery. Specifically, the Court ordered Williams to produce a picture of Ken Sisk from 2012, the year of service. *See* 12/1/21 Order (Dckt. No. 76). The Court wanted to know what Sisk looked like at the time, because the process server verified that the person in the garage looked like the photo on Williams's driver's license. *See* Return of Service, at 2 (Dckt. No. 38) ("I identified the Defendant Michael Williams by the attached photo . . . ."). The Court also ordered Williams to produce records about where he resided in August 2012. *See* 12/1/21 Order (Dckt. No. 76). In addition, the Court ordered Williams to disclose his height and his age, and the age of Sisk. (This Court already knew Sisk's height.) *See* 12/3/21 Order (Dckt. No. 80).

Williams later filed a picture of Sisk – a state identification card from 2018. *See* Sisk ID Card (Dckt. No. 77-1). The Court took a close look at the pictures, but even a passing glance reveals that they look nothing alike. The picture of Williams on his driver's license looks nothing like the picture of Sisk on his identification card. *Compare* Williams Driver's License (Dckt. No. 38, at 3 of 3; Dckt. No. 85-3, at 3 of 3), *with* Sisk ID Card (Dckt. No. 77-1; Dckt. No. 85-5).

Williams also disclosed his age and height, and the age and height of Sisk. *See* Def.'s Statement (Dckt. No. 81). They're roughly the same age – Williams is 66, and Sisk is 63. And they're about the same height – Williams is 6' 1", and Sisk is 6' 3". *Id.*

Williams filed a statement claiming that his primary residence in August 2012 was on Wheat Way in Fairplay, Colorado. *See* Def.'s Statement, at 1 (Dckt. No. 81). That representation sits uncomfortably with a representation to the IRS. In a 2012 tax filing, Williams represented that he resided at 3936 Bell Mountain Drive in Castle Rock, Colorado. *See* 2012

12

Tax Filing (Dckt. No. 87-2, at 2–3 of 110). He represented that he owned a dwelling at Wheat Way in Fairplay, Colorado – as *rental* property. *Id.* at 10 of 110.

A few days before the hearing, the story started to unravel. Williams unceremoniously filed a motion to withdraw the Sisk declaration. *See* Mtn. to Withdraw the Dec. of Ken Sisk (Dckt. No. 82). The motion included only one sentence, and offered no explanation. *Id.*

Six minutes later, the attorney for Williams filed a motion to withdraw as counsel. *See* Counsel for Def.'s Emergency Mtn. (Dckt. No. 83). Once again, the motion was cursory, offering no explanation. The only exception was a citation to Local Rule 83.16, which governs the rules of professional conduct. *Id.*

Two days later, another shoe dropped, and another witness dropped out. Williams filed his witness list. It read as follows: "Witnesses: None." *See* Def.'s Exhibit List and Witness List (Dckt. No. 89).

Williams filed a statement that he had "lost contact" with Beach. *See* Def.'s Statement, at ¶ 10 (Dckt. No. 88). And despite several attempts, Williams was "presently unable to get in contact with Ms. Beach." *Id.* He predicted future unavailability, too. "Defendant continues to attempt contact but does not expect that they will be able to prior to the present date of this matter's evidentiary hearing." *Id.*

## IV.    The Hearing

The hearing went forward as scheduled. This Court presided over an evidentiary hearing on December 13, 2021.

Off the bat, the Court addressed the motion to withdraw as counsel, and asked for the basis for the motion. Defense counsel responded that the reason was privileged, but then added that "new information has come to light very recently, specifically Wednesday of last week," that

limited his ability to represent his client. *See* 12/13/21 Tr., at 8–9.[4] Wednesday means Wednesday, December 8, the day that defense counsel filed the motion to withdraw the declaration of Ken Sisk. *See* Mtn. to Withdraw Dec. of Ken Sisk (Dckt. No. 83). And defense counsel acknowledged that the motion to withdraw as counsel had a relationship to the motion to withdraw that declaration. *See* 12/13/21 Tr., at 9.

Williams then requested a few months to find a new attorney, which this Court denied because of the passage of time in this 2008 case. Too much time has passed already (and the Court was concerned about delay tactics), and the issues in the evidentiary hearing were limited. Williams could represent himself as a *pro se* litigant.

That's when defense counsel advised his client not to testify at the hearing, based on the Fifth Amendment. *Id.* at 11–14. And in response to questions from this Court, Williams expressed that he planned to assert his right against self-incrimination, and refuse to answer any questions. *Id.* at 13–14.

When this Court made clear that the hearing would go forward regardless, defense counsel changed his tune. *Id.* at 23. He reframed the motion to withdraw as counsel as a motion to delay the hearing to obtain new counsel. *Id.* at 24 ("The motion requested time for him to find replacement counsel."); *id.* at 11. He asked for an opportunity to participate in the hearing, and cross examine the witnesses. *Id.* at 24.

That switch did not mesh well with the original basis for the motion to withdraw. As this Court noted at the time, either counsel had an ethical issue, or he didn't. *Id.* at 23–24. Still, this Court ruled that defense counsel could participate in the hearing after all. In effect, counsel withdrew the motion to withdraw *as counsel*.

---

[4] The citations to the record are to the rough, unofficial transcript. It is possible that the page numbers in an official transcript might be a little different.

The Court next addressed the motion to withdraw the declaration of Ken Sisk. Defense counsel explained that he filed the motion after receiving privileged information from his client (and after consulting counsel in his own right). Defense counsel explained that he personally prepared the declaration. But he did so based on information provided exclusively by Williams himself. *Id.* at 16–20. Defense counsel never interviewed Sisk, and has never spoken with him or communicated with him in writing. *Id.* Instead, he relied on a letter that allegedly came from Sisk, which counsel received from Williams.[5]

At that point, the Court heard testimony. Perez and the government presented two witnesses (plus Williams). Ronald Nixon, the process server, testified first. He testified unequivocally that he served Williams on August 14, 2012. There was no doubt in his mind.

The second witness was Debra Schmall, a paralegal in the Financial Litigation Program of the U.S. Attorney's Office. She testified about communications with Williams in the last two years about his outstanding judgment.

Williams called no witnesses. Sisk did not testify. Neither did Beach. And neither did Williams. In fact, when called adversely, Williams asserted the Fifth Amendment. He refused to answer any and all questions about service of process, and about the preparation of the declarations.

There's foul play in Fairplay, Colorado (and in Castle Rock, too).

### Discussion

Nine years after the entry of judgment, Williams asks this Court to vacate the judgment for lack of service of process. *See* Fed. R. Civ. P. 60(b)(4). The issue boils down to the identity

---

[5] The same is true for the preparation of the declaration of Katie Beach, the longtime friend who went mysteriously missing. Defense counsel prepared her declaration without ever talking with her. *See* 12/13/21 Tr., at 109–112. Defense counsel agreed that the sudden disappearance of Beach was strange. *Id.* at 114.

of the person in the garage on the day of service. It is a variation of a whodunit, but it isn't much of a mystery.

Under the Federal Rules, a party must bring a challenge within a reasonable time, and for some types of challenges, the window of opportunity closes after one year (if not before). *See* Fed. R. Civ. P. 60(c)(1). But it's never too late to challenge a void judgment. If a defendant wasn't served, then there was no lawful judgment in the first place. *See Pennoyer v. Neff*, 95 U.S. (5 Otto) 714 (1877). So the motion at hand is timely, even though it comes years after the fact.[6]

Rule 4(e) governs the methods of effectuating service of process. A person may serve a party with process in a judicial district of the United States by:

    (1)    following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

    (2)    doing any of the following:

        (A)    delivering a copy of the summons and of the complaint to the individual personally;

---

[6] Based on the plain language of Rule 60(c)(1), a party must challenge a judgment within a "reasonable time." *See* Fed. R. Civ. P. 60(c)(1). The text suggests that the obligation applies to every type of motion under Rule 60(b). "A motion under 60(b) must be made within a reasonable time – and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." *Id.* Notice how Rule 60(c)(1) imposes a time limit – within a "reasonable time" – that applies to any "motion under Rule 60(b)," without exception. *Id.* But in practice, courts do not apply the "reasonable time" rule to motions arguing that the judgment was void in the first place. *See Philos Techs., Inc. v. Philos & D, Inc.*, 645 F.3d 851, 857 (7th Cir. 2011) ("[A] party may challenge a default judgment as void for lack of personal jurisdiction at any time . . . .") (cleaned up); 11 Charles Alan Wright *et al.*, Federal Practice & Procedure § 2862 (3d ed. 2021) ("[T]here is no time limit on an attack on a judgment as void."). The thinking is that a "reasonable time" is *any* time because there was never a valid judgment in the first place. *See Pacurar v. Hernly*, 611 F.2d 179, 181 (7th Cir. 1979). In addition, the text places a second time-based hurdle for motions under Rule 60(b)(1), (b)(2), and (b)(3) – a party must bring those motions within a reasonable time *and* within one year. *Id.* But a motion about the lack of service of process is about whether a judgment is void within the meaning of Rule 60(b)(4), so the one-year time limit does not apply, either.

        (B)      leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

        (C)      delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

*See* Fed. R. Civ. P. 4(e)(1), (2).

Perez obtained a default judgment based on an affidavit of service from the process server, which was signed and dated two days after service. *See* Return of Service (Dckt. No. 38). The affidavit of service creates an uphill battle for Williams.

"A signed return of service constitutes prima facie evidence of valid service which can be overcome only by strong and convincing evidence." *O'Brien v. R.J. O'Brien & Assocs., Inc.*, 998 F.2d 1394, 1398 (7th Cir. 1993). "To make a prima facie showing, the movant must simply produce a return of service identifying the recipient and noting when and where service occurred, thereby providing enough detail so the opposing party knows what evidence he must rebut." *Relational, LLC v. Hodges*, 627 F.3d 668, 672 (7th Cir. 2010); *see also* 1 James Wm. Moore *et al.*, Moore's Federal Practice § 4.100 (3d ed. 2020) ("If the defendant challenges service, the plaintiff bears the initial burden of proving that service of process was properly made. But a filed proof of service satisfies that initial burden, and a mere allegation by defendant that process was not served, without some additional evidence, is insufficient to refute the validity of an affidavit of service.").

Perez met her prima facie burden. She came forward with a proof of service that identified the recipient as Williams himself. *See* Return of Service (Dckt. No. 38). The return of service stated where service took place (at 3936 Bell Mountain Drive in Castle Rock, Colorado), and when (August 14, 2012). *Id.* The proof of service also explained how the process server made the identification (by using the Williams's driver's license). *Id.* The proof of service also

17

confirmed that the process server identified the documents being served. *Id.* ("I cited that the summons, complaint, notice and Order dated 11/23/10 were served by refusal . . . ."). The process server signed the proof of service under penalty of perjury. *Id.*

Based on that showing, the burden shifted to Williams "to rebut, by strong and convincing evidence, the presumption of service." *See Relational*, 627 F.3d at 673. "Strong and convincing evidence is required to rebut a proof of service. Thus, after plaintiff files proof of service, a defendant refuting the validity of service bears the burden of proof to overcome prima facie evidence of proper service." *See* 1 James Wm. Moore *et al.*, Moore's Federal Practice § 4.100 (3d ed. 2020). In the end, it comes down to a "credibility determination[] of the district court." *See Relational*, 627 F.3d at 673.

Resolving a question of fact about service of process requires an evidentiary hearing. An affidavit from the party asserting service of process "is presumed true only until it is disputed." *Durukan Am., LLC*, 787 F.3d at 1163. At that point, the party who obtained the judgment must demonstrate that service of process actually took place. That process requires a hearing. District courts do not simply read the affidavits, and declare the winner. *Id.* at 1163–64 (citing *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). "[A] judge cannot take two affidavits which swear to opposite things and say, 'I find one of the affidavits more credible than the other, and therefore I shall accept it as true.'" *Id.* at 1164 (quoting *Castillo v. United States*, 34 F.3d 443, 446 (7th Cir. 1994)).

To get to the bottom of things, this Court presided over an evidentiary hearing. The testimony at the hearing cemented the fact that Williams received service of process long ago. The process server, Ronald Nixon, testified about what took place on that summer day in Colorado in 2012. His testimony was clear, direct, persuasive, and credible.

18

Nixon recalled the day that he served Williams at his home at 3936 Mountain Drive in Castle Rock, Colorado. He even recalled what the property looked like. "That particular residence is off of a long road and has a very long curved driveway that leads up to the residence." *See* 12/13/21 Tr., at 29–30. During his examination, he identified pictures of the property. *Id.* at 30–31.

Nixon recounted his memorable interaction with Williams. Once he pulled up to the house, Nixon spotted Williams in the garage. *Id.* at 33. Nixon carried a picture of Williams's driver's license with him at the time. He compared the picture on the license to the person in the garage, and confirmed that he found the right guy. *Id.* at 33–35. Nixon testified unequivocally that he served Williams:

> Q: All right. And you said you saw Michael Williams. Is this a picture [on the license] of Michael Williams?
>
> A: Yes, it is.
>
> Q:  Is this the person that you saw in August 2012?
>
> A: Yes, it is.

*Id.* at 34 (Direct Exam.).

Nixon testified that he identified Williams by looking at the driver's license and confirming the distinctive facial features:

> Q: Did you have the license with you at the time?
>
> A: Yes, it was with the documents. I carried it with the documents that I was intending to serve.
>
> Q: And did you hold it up and compare the face on the picture with the face of the person in the garage?
>
> A: Yes, sir, I did.

> Q:     And at the time did you use that picture and make sure that you
>          had a match?
>
> A:     Yes, Your Honor, I did.
>
> Q:     Are you sure that the person you served looked the same as the
>          person in the driver's license photo?
>
> A:     Yes, Your Honor, I did.  Mr. Williams has a very distinctive facial
>          features.

*Id.* at 34–35 (Exam. by the Court).

At that point, things went sideways.  Nixon called Williams by name, but Williams denied who he was.  As Nixon testified:  "When I saw Mr. Williams, I spoke his name, 'Mr. Williams,' he said 'No, I'm not.'"  *Id.* at 35.  Williams said "I am not Mr. Williams."  *Id.*

But the person in the garage didn't give his name either.  Nixon testified that the person denied that he was Williams, but he never divulged his name:

> Q:     When you approached the individual in the garage and you said,
>          Mr. Williams, I'm serving you, and the person denied that he was
>          Mr. Williams, did that person give you his name?
>
> A:     No, sir, he did not.
>
> Q:     For example, did the person say "I'm not Mr. Williams, I'm Bob,
>          I'm Larry," anything like that?
>
> A:     Nothing else.
>
> Q:     Did that strike you as odd?
>
> A:     I believed that if it were someone else they would have told me
>          their name, yes.

*Id.* at 59 (Exam. by the Court).

Nixon then announced that he was serving Williams with process.  Nixon told him that he was being served by refusal, and Nixon left the documents on the garage floor.  *Id.* at 35.

That's when things got even more wacky. Nixon turned around, walked to his car, and got inside. *Id.* at 35–36. Williams walked up to the car, came to the driver's side door, and started waving the papers. *Id.* at 36. At that point, Williams "put them on the windshield wiper of [Nixon's] vehicle." *Id.*

Nixon then pulled away. In a flash of quick-thinking, Nixon turned on his windshield wipers. *Id.* at 37. The wipers pushed the papers off the windshield and onto the ground. *Id.* Nixon then drove off, leaving Williams and the papers in the rearview mirror. *Id.*

Williams wasn't happy. Nixon testified that "[h]is face and body language indicated both aggressive and anger." *Id.* "I could tell because his eyes were very clearly angry and he was shaking the papers at me before he put them under the windshield wiper." *Id.*

Nixon testified that he has no doubt that he served Williams:

> Q:   As you sit here today, do you have any doubt at all that the person you served was the person in the driver's license photo?
>
> A:   No, Your Honor, I don't.
>
> Q:   As you sit here today, do you have any reason to doubt that the person that you served is Michael Williams?
>
> A:   I have no reason to doubt that, Your Honor.

*Id.* at 34–35 (Exam. by the Court). And again:

> Q:   Can you please describe again how sure you are that Mr. Williams is the person that you served on August 14th, 2012?
>
> A:   Yes, Your Honor. I was able to identify Mr. Williams from that picture in 2006 [the date of the license] as well as my recollection of seeing him at that time. Mr. Williams has a very distinctive facial shape, it's rectangular, very tall forehead and distinctive eyes. That's how I was able to recognize him. And he also has the same square jaw.

*Id.* at 58 (Exam. by the Court).

21

Nixon even took another look at Williams at the hearing, and identified him as the person who received the papers:

> Q:      Mr. Williams, I'd like you to come close to your camera, nice and close, and I'd like you to take off your mask.  Come nice and close to the camera so Mr. Nixon can see you nice and clear. Come as close as you can, please. A little closer.  Mr. Nixon, is this the person that you served on August 14th, 2012?
>
> A:      Yes, sir, it is.
>
> Q:      Are you sure about that?
>
> A:      Yes, I am.

*Id.* at 57–58 (Exam. by the Court).

Counsel showed Nixon a picture of Ken Sisk, the would-be mechanic.  And Nixon testified that he didn't recognize Sisk at all.  *Id.* at 38.  He was "absolutely sure" that Sisk is not the person who he served.  *Id.* at 39.  "He does not have the same facial features, facial shape as the defendant that I served."  *Id.*  He testified:

> Q:      Is there any chance based on this picture that you served Mr. Sisk and not Mr. Williams?
>
> A:      There is absolutely no question in my mind, Your Honor.

*Id.* at 39 (Exam. by the Court); *see also id.* at 47 (testifying that there was "no way" that he could be mistaken); *id.* at 48–49 (testifying that he had "absolutely no doubt" that he served Williams); *id.* at 58–59 (explaining how Williams and Sisk don't look alike).

The cross examination did not put a dent in the testimony.  Defense counsel elicited testimony that Nixon had been trying to serve Williams for months.  *Id.* at 40–44.  Nixon went to the property more than 10 times, without success, from March 2011 to August 2012.  *Id.* at 51–52.

Defense counsel later argued that the lack of success shows that Williams wasn't there. But the repeated lack of success is equally consistent – in fact, it is far more consistent – with a long-running evasion of service of process. There is no dispute that Williams owned that property. Williams even gave the cold shoulder to the Sheriff's Office.

At times, the defense theory seemed to be that Nixon fudged service because of an imminent Court deadline for service of process. *Id.* at 43–46. In his motion, Williams argues that it is "easy to imagine Mr. Nixon's motivation, conscious or not, to ensure that he returned ***some*** proof of service in August 2012," given that it was the "last opportunity to effectuate service." *See* Mtn. to Vacate, at 7 (Dckt. No. 63) (emphasis in original).

But Nixon testified that he received the same fee, regardless of whether he successfully completed service, so he had no incentive to serve the wrong person. *See* 12/13/21 Tr., at 28. He testified that he felt no special pressure to say that he served Williams. *Id.* at 60–61. A deadline to serve process didn't give him a reason to cut corners. *Id.* at 61. And he wouldn't have signed the proof of service in 2012 if he wasn't sure that he served the right person. *Id.* at 59.

Defense counsel also questioned how Nixon could have remembered this episode. He made the point that the service of process took place years ago, and that Nixon served papers over a hundred times a month. *Id.* at 46–47.

But Nixon explained why this particular incident was so memorable. It was the only time in his career that someone had stuck the papers under his windshield wipers. *Id.* at 59–60. "I've never had anyone put the papers under my windshield wiper before. I've had them thrown back at me, but nothing like what happened this day." *Id.* at 60.

In light of the on-again, off-again, on-again relationship with counsel, the Court permitted Williams to personally cross examine Nixon, too. *Id.* at 53. The questions did not move the needle. For example, one question involved whether Nixon parked on concrete or dirt. *Id.* at 54. If anything, Williams elicited testimony that solidified that Nixon did, in fact, serve him. For example:

> Q: Okay. Okay. Is it possible, as was stated earlier, that you served somebody other than Mike Williams?
>
> A: No, sir, that's not possible.
>
> Q: Okay. And that's based on what?
>
> A: That's based on the physical description that I was given. It's based on the picture that I was given and the identification that I made at that time.

*Id.* at 56 (Exam. by Williams).

The government then called a second witness, Debra Schmall. *Id.* at 63. She was a financial litigation agent in the financial litigation unit at the U.S. Attorney's Office. *Id.* at 64. She testified about efforts to collect on the judgment against Williams. She reviewed records showing that Williams was registered to vote using the 3936 Bell Mountain address as of 2012. *Id.* at 67.

She also testified that Williams came to the U.S. Attorney's Office in 2019 to discuss the outstanding judgment, after receiving notices from the Treasury Department. *Id.* at 70, 72. Williams claimed that he was broke. Actually, it was worse. "He said that he was unemployed and essentially homeless, sleeping on friends' couches and he had nothing." *Id.* at 70.

In reality, Williams continued to own the Bell Mountain property and the Wheat Way properties at that time. *Id.* at 71. And Schmall testified that Williams recently sold the Bell Mountain property for $1.3 million. *Id.*

Counsel for Perez presented one other piece of evidence. Counsel pointed out that Williams submitted tax records to support his motion to vacate the judgment. And the tax records from 2012 listed his address as 3936 Bell Mountain Property in Castle Rock, Colorado. *See* 2012 Tax Records (Dckt. No. 87-2, at 1, 3 of 110). The tax filing did mention the property on Wheat Way in Fairplay, Colorado. *Id.* at 10 of 110. But Williams listed that parcel as *rental* property. *Id.*; *see also* 12/13/21 Tr., at 86–90.

At that point, the government called Williams to testify. *See* 12/13/21 Tr., at 91. But Williams refused to testify, invoking his right against self-incrimination under the Fifth Amendment.[7] *Id.* He refused to answer whether he was served with process on August 14, 2012. *Id.* at 94–98. He declined to answer questions about his declaration, and the Sisk declaration. *Id.* at 93–94. He wouldn't testify about whether the declarations were false. *Id.* at 98–102.

This Court confirmed that Williams was asserting the Fifth Amendment on any and all questions about service of process, his declaration, the Sisk declaration, and the Beach declaration. *Id.* at 103.

At that point, the Court offered Williams the opportunity to call any witnesses. *Id.* at 108, 115. He presented none. Instead, he renewed his motion to withdraw the Sisk declaration, which the Court granted. *Id.* at 108.

Based on the record as a whole, this Court has little trouble concluding that Williams was served with process on August 14, 2012. Perez met her prima facie burden by presenting the proof of service from Nixon, who prepared it under penalty of perjury two days later. At the

---

[7] For the sake of simplicity, this Court put aside the issue of whether Williams had already waived the Fifth Amendment by submitting a declaration that gave his version of the story. *See* Williams Dec. (Dckt. No. 63-3); 12/13/21 Tr., at 92–93.

hearing, Nixon was credible and compelling. He remembered the details of this particular episode quite well, and based on the story at hand, it undoubtedly left an impression.

There is every reason to believe, and no reason to doubt, that Williams received service of process. Williams came forward with declarations from three witnesses. The first declaration allegedly came from Ken Sisk, but it was not long for this world. Williams withdrew it before the hearing, undoubtedly because of substantial concerns about its veracity and/or authenticity. The second declaration came from Katie Beach, the longtime friend who couldn't be found when it came time to testify. So Williams offered two alibi witnesses, neither of whom testified at the evidentiary hearing.

The third declaration came from Williams himself. But even Williams abandoned the story that he told in his declaration. When the time came to tell his side of the story at the hearing, Williams went silent. He said nothing, except repeated assertions of the Fifth Amendment. In a civil case, unlike a criminal case, an assertion of the Fifth Amendment can give rise to an adverse inference. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995) ("The rule that adverse inferences may be drawn from Fifth Amendment silence in civil proceedings has been widely recognized by the circuit courts of appeals, including our own."); *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 (1923) ("Silence is often evidence of the most persuasive character.") (Brandeis, J.).

Based on the record as a whole, the Court finds that Nixon did, in fact, deliver the papers to Williams at his residence on August 14, 2012. And that delivery means that Williams received service of process. It makes no difference that Nixon left the papers on the floor of the

26

garage, and at the feet of Williams, without placing the papers in his hands. Service of process is not exactly a game of tag, where a failure to touch is a failure to tag.

A defendant cannot evade service of process by refusing to take or touch papers that are handed to him. Physical proximity to an disagreeable defendant is enough. *See, e.g.*, 4A Charles Alan Wright *et al.*, Federal Practice & Procedure § 1095 (4th ed. 2021) ("If the defendant attempts to evade service or refuses to accept delivery after being informed by the process server of the nature of the papers, it usually is sufficient for the process server to touch the party to be served with the papers and leave them in defendant's presence or, if a touching is impossible, simply to leave them in the defendant's physical proximity. It is not crucial in these circumstances that the defendant does not take the papers into his or her possession."); 62B Am. Jur. 2d, Process, § 190 (2005) ("While personal service of process does not require 'in hand' delivery, it should not become a game of wiles and tricks and a defendant should not be able to defeat service simply by refusing to accept the papers or by instructing others to reject service. Even though a defendant refuses physical acceptance of a summons, service is complete if a defendant is in close proximity to a process server under such circumstances that a reasonable person would be convinced that personal service of the summons is being attempted."); *Hanna v. Plumer*, 380 U.S. 460, 470 (1965) (holding that in-hand service is not required in federal courts); *Norris v. Causey*, 869 F.3d 360, 370 (5th Cir. 2017) ("[A] defendant's refusal to accept service is not rewarded when the process server announces the nature of the documents and leaves them in close proximity to the defiant defendant."); *Travelers Cas. and Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1136 (9th Cir. 2009) ("Sufficient service may be found where there is a good faith effort to comply with the requirements of Rule 4(e)(2) which has resulted in placement of the summons and complaint within the defendant's immediate proximity . . . ."); *Durant, Nichols,*

27

*Houston, Hodgson & Cortese–Costa P.C. v. Dupont*, 169 F. App'x. 45, 46 (2d Cir. 2006) (stating that "where a defendant refuses to accept service, the papers may be left in his general vicinity," but making clear that "a process server who elects the 'general vicinity' option must 'bring the questioned process within the purview of the person to be served,' since 'the defendant must be made aware that he or she is in fact being served with process'") (citations omitted); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1275 n.5 (N.D. Cal. 2004) ("Where a defendant attempts to avoid service *e.g.* by refusing to take the papers, it is sufficient if the server is in close proximity to the defendant, clearly communicates intent to serve court documents, and makes reasonable efforts to leave the papers with the defendant.").

Based on a preponderance of the evidence (and then some), the Court finds that Williams received service of process by personal delivery at his residence on August 14, 2012. That service satisfied the requirements of Rule 4(e)(2)(A),[8] and thus triggered a duty to respond to the complaint.

Williams elected not to respond to the complaint, and a default judgment later followed. That was his choice, but it comes at a price. The price now is that this Court will enforce the lawful judgment, including the companion motion to execute a sale of one of his properties in Chicago. *See* Mtn. for Writ of Execution (Dckt. No. 65). Williams evaded service of process for months, and the evasive maneuvers continued to the present day. But he has run out of room to maneuver.

---

[8] The facts at hand support service of process by refusal within the meaning of Colorado Rule 4(k), too. *See* C.R.C.P. 4(k) ("If a person to be served refuses to accept a copy of the process, service shall be sufficient if the person serving the process knows or has reason to identify the person who refuses to be served, identifies the documents being served, offers to deliver a copy of the documents to the person who refuses to be served, and *thereafter leaves a copy in a conspicuous place*.") (emphasis added).

**Conclusion**

The motion to vacate the judgment is hereby denied.


Date:   January 5, 2022                    _____

                                           Steven C. Seeger
                                           United States District Judge